**Hearing: May 24, 2022 at 10:00 a.m.**
**Objection Filing Deadline: May 17, 2022 at 5:00 p.m.**

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Alan Nisselson, Chapter 7 Trustee*
156 West 56th Street
New York, New York 10019
Telephone (212) 237-1000
Attorneys Appearing: Leslie S. Barr (lbarr@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re | Chapter 7 |
|---|---|
| CD II FASHIONS, LLC, | Case No. 20-11101-mew |
| Debtor. | |

**NOTICE OF TRUSTEE'S MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 105(a)
AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(a)
APPROVING SETTLEMENT AGREEMENT AMONG THE TRUSTEE,
JUMP DESIGN GROUP, INC. AND GLENN SCHLOSSBERG, AND THE CIT
GROUP/COMMERCIAL SERVICES INC.**

**PLEASE TAKE NOTICE** that upon the motion (the "*Motion*") of Alan Nisselson ("*Trustee*"), trustee for the Chapter 7 Estate ("*Estate*") of CD II Fashions, LLC, by his undersigned counsel, Windels Marx Lane & Mittendorf, LLP ("*Windels Marx*"), a hearing will be held before The Honorable Michael E. Wiles, United States Bankruptcy Judge, in his courtroom at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, **on May 24, 2022 at 10:00 a.m., prevailing Eastern time** (the "*Hearing*"), or as soon thereafter as counsel may be heard, for the entry of an Order approving the Trustee's Settlement Agreement with Jump Design Group, Inc. ("*Jump*") and Glenn Schlossberg ("*Schlossberg*"), and The CIT Group/Commercial Services Inc.. ("*CIT*"), attached to the Motion as Exhibit "1".

{12033217:1}

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, available on the Court's website at www.nysb.uscourts.gov (the "*Court's Website*"), the Court is not holding in-person hearings at this time; **the Hearing will be conducted telephonically**. Parties and counsel wishing to participate in the Case Management Conference telephonically must register with Court Solutions no later than one day before the Case Management Conference. Information on how to register with Court Solutions can be found in General Order M-543 and on Court Solutions' website at https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that the Motion may be inspected on the Court's Website (www.nysb.uscourts.gov), or by request to undersigned counsel. A Pacer password is required to access documents on the Court's Website.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Motion must be in writing, conform to the Bankruptcy Code, the Bankruptcy Rules and the Court's Local Rules, be electronically filed with the Bankruptcy Court in accordance with General Order No. M-399, which, along with the User's Manual for the Electronic Case Filing System, can be found at the Court's Website, and be served so as to be **received by no later than May 17, 2022 at 5:00 p.m.** prevailing Eastern time to: (i) undersigned counsel for the Trustee, Windels Marx, (ii) counsel to CIT, Thompson Coburn Hahn & Hessen, LLP, 488 Madison Avenue, New York, New York 10022, Attn: Joshua I. Divack, Esq., email: jdivack@thompsoncoburn.com; (iii) counsel to Jump and Schlossberg, Sills Cummis & Gross, P.C., The Legal Center, One Riverfront Plaza, Newark, NJ, 07102, Attn: George Hirsch, Esq., email: ghirsch@sillscummis.com, and (iv) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Greg Zipes, Esq., email: Greg.Zipes@usdoj.gov.

**PLEASE TAKE FURTHER NOTICE** only those responses that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Trustee without further notice. Parties who timely file responses or objections are required to attend the Hearing and failure to attend in person or by counsel (telephonically) may result in relief being granted or denied upon default.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be adjourned from time to time without any further notice except for an announcement at the Hearing.

Dated: New York, New York  WINDELS MARX LANE & MITTENDORF, LLP
       April 15, 2022  *Attorneys for Alan Nisselson, Chapter 7 Trustee*

                          By:   */s/ Leslie S. Barr*_____
                                 Leslie S. Barr (lbarr@windelsmarx.com)
                                 156 West 56th Street
                                 New York, New York 10019
                                 Tel. (212) 237-1000 / Fax. (212) 262-1215

**Hearing date and time: May 24, 2022 at 10:00 a.m. (prevailing Eastern Time)**
**Objections deadline: May 17, 2022 at 5:00 p.m. (prevailing Eastern Time)**

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Alan Nisselson, Chapter 7 Trustee*
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000 / Fax. (212) 262-1215
Attorney appearing:   Leslie S. Barr (lbarr@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re | |
|---|---|
| CD II FASHIONS, LLC, | Chapter 7 |
| | Case No. 20-11101-mew |
| Debtor. | |

**TRUSTEE'S MOTION PURSUANT TO 11 U.S.C. § 105(a) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(a) FOR ORDER APPROVING SETTLEMENT AGREEMENT AMONG THE TRUSTEE, JUMP DESIGN GROUP, INC. AND GLENN SCHLOSSBERG, AND THE CIT GROUP/COMMERCIAL SERVICES INC.**

**TO THE HONORABLE MICHAEL E. WILES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Alan Nisselson (the "***Trustee***"), trustee for the chapter 7 estate (the "***Estate***") of CD II Fashions, LLC ("***Debtor***" or "***CD II***"), by and through his attorneys, Windels Marx Lane & Mittendorf, LLP, respectfully requests through this motion (the "***Motion***") and the supporting declaration of the Trustee, the entry of an Order approving his settlement agreement with Jump Design Group, Inc. ("***Jump***") and Glenn Schlossberg ("***Schlossberg***", and collectively with Jump, the "***Jump Parties***"), and The CIT Group/Commercial Services Inc. ("***CIT***"), attached as **Exhibit "1"** (the "***Settlement Agreement***").  The Trustee, Jump, Schlossberg, and CIT are sometimes referred to together as "***Parties***".

{12033982:1}

## I. Preliminary Statement

1. Following the conversion of the Debtor's bankruptcy case (the "**Bankruptcy Case**"), the Estate had virtually no cash on hand. The only assets of the Estate were accounts receivable and unsold inventory, all of which were subject to a lien held by Debtor's factor/secured lender CIT.

2. To liquidate these assets, the Trustee entered into arrangements with CIT subject to a later determination of the Debtor's and CIT's rights to the resulting proceeds.

3. The Trustee also reviewed the Debtor's books and records to ascertain the existence of avoidance or other claims to bring monies into the Estate.

4. The Trustee thereafter concluded that he had fraudulent conveyance and breach of duty claims aggregating approximately $9.7 million against Schlossberg, the sole Manager of CD II, and Jump, CD II's parent entity (of which Schlossberg is President).

5. Beginning in the summer of 2021 and continuing into early 2022, counsel for the Trustee and counsel for the Jump Parties engaged in extensive settlement negotiations to resolve these claims without the need for litigation.

6. The Jump Parties and the Trustee thereafter reached an agreement in principle as to the monetary terms of the settlement, whereby the Jump Parties agreed to pay $5.3 million to the Estate in settlement of the potential claims against them.

7. As described below, CIT had a lien on Jump's assets and Schlossberg had pledged substantial assets to CIT.

8. To facilitate the Jump Parties' ability to pay such a settlement amount, the Trustee sought and reached an agreement with CIT pursuant to which CIT agreed to partially fund the settlement payment.

9. As a result, the Parties were able to move forward with a global settlement embodied in the Settlement Agreement requiring the Jump Parties to pay, or cause to pay, $5.3

{12033982:1}                                                  2

million (the "*Settlement Amount*") to the Trustee for the benefit of the Estate in full satisfaction of the Trustee's claims.

10. In addition, as part of the global settlement, CIT agreed to withdraw with prejudice its bankruptcy claim of over $24 million.

11. Accordingly, the agreement will expunge more than half the amount of claims in the Bankruptcy Case, which will allow the Trustee to make meaningful distributions to general unsecured creditors of the Estate.

12. For the reasons set forth below, the Trustee submits that the proposed settlement falls well within the range of reasonableness and he respectfully requests that the Court approve the Settlement Agreement.

## II.   Jurisdiction; Venue; Statutory Bases

13. This Court has jurisdiction of this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are Sections 105(a) and 362 of title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").

## III.   Procedural Background

14. On May 4, 2020 (the "*Petition Date*"), RAS International, Nantong Kyueda Trading Co. Ltd., and Temost Investments Ltd. filed an involuntary petition for relief against the Debtor under Chapter 11 of the Bankruptcy Code.

15. On June 15, 2020, this Court entered an order for relief in the case. (Doc. 10).

16. By Order dated June 25, 2020, the Court converted the Debtor's case to a case under Chapter 7 of the Bankruptcy Code. (Doc. 20).

17. The Trustee is the duly appointed, qualified, permanent trustee for this Estate.

### IV. Facts

**A.    The Parties.**

18. Jump is a clothing designer and manufacturer incorporated in 1991 as a domestic business corporation in the State of New York.

19. In or about June 2018, Jump acquired Cathy Daniels Fashion, a sportswear apparel company. In conjunction with that acquisition, on or about June 25, 2018, CD II was formed as a wholly owned subsidiary of Jump to manufacture and market women's apparel for wholesale.

20. Schlossberg is President of Jump, CD II's sole member, and was the Manager of CD II.

21. As detailed below, CIT provided financing to Jump and CD II pursuant to separate factoring agreements with both parties.

**B.    The Trustee's Potential Claims against Schlossberg and Jump.**

   **(i)    The Debtor's $1.5 Million Payment to Schlossberg.**

22. The Trustee's review of the Debtor's books and records indicated that on August 30, 2018, just two months after CD II was formed, the Debtor transferred $1.5 million to a bank account held in Schlossberg's name (the "***$1.5 Million Schlossberg Payment***").

23. The Trustee determined that he could seek to recover the $1.5 Million Schlossberg Payment as a fraudulent conveyance or under common law claims. The Jump Parties contend that the $1.5 Million Schlossberg Payment was paid back overtime.

{12033982:1}    4

**(ii)    The Debtor's Payment to Jump of More Than $8.2 Million in Additional Management Fees.**

24.     Based on the Trustee's review of the Debtor's books and records, it appears that Jump charged CD II a flat 6% sales management fee based on Debtor's gross sales (the "***6% Fee***") from July 2018 to March 2020.

25.     From January 2019 through March 2020, it appears that Jump charged the Debtor additional management fees that more than doubled the 6% Fee (the "***Additional Management Fees***"). Between January 2019 and March 2020, the Additional Management Fees charged to the Debtor totaled $8,240,627.45. For 2019, the Additional Management Fees resulted in the Debtor's books and records reflecting a net loss to the Debtor of approximately $5.8 million rather than a profit of approximately $800,000.

26.     The Trustee's investigation further revealed that the Debtor appears to have first booked the Additional Management Fees in its general ledger in June 2020 shortly before the appointment of the Trustee.

27.     The Trustee determined that he could recover the Additional Management Fees from Jump as fraudulent conveyances and through breach of fiduciary duty claims[1] against Schlossberg, Michael Gross ("***Gross***") and Lance Baran ("***Baran***").[2] The Jump Parties contend that the 6% was accounted for in connection with a CD II consulting agreement to which Jump was not a party, with actual management fees to be adjusted.

---

[1] In July 2021, counsel for the Trustee provided notice of his breach of fiduciary claims to Jump's insurer Chubb Group of Insurance Companies ("***Chubb***"). The insurance policy had a coverage limit totaling $1.5 million with respect to directors and officers liability claims.

[2] During events described herein, Gross was the Chief Financial Officer of Jump and Baran was an officer of Jump and was described in the Debtor's schedules as the Controller of CD II as of September 2019.

{12033982:1}                              5

**C.     CIT's Claim against the Debtor.**

28.    CIT and Jump are parties to a Factoring Agreement dated as of October 1, 2011 (as amended, modified, or supplemented, the "***Jump Factoring Agreement***") pursuant to which, among other things, (a) Jump sold and assigned to CIT, and CIT purchased, Jump's accounts, and CIT made loans, advances, and other financial accommodations to Jump (the "***Jump Factoring Facility***"), and (b) as security for Jump's indebtedness and obligations to CIT, Jump granted to CIT liens and security interests in substantially all of Jump's assets.  CIT asserts that as of April 14, 2022, Jump was obligated to CIT under the Jump Factoring Agreement for approximately $10 million plus any unliquidated amounts not yet charged into Jump's account.

29.    CIT and the Debtor are parties to a Factoring Agreement dated as of July 6, 2018 (as amended, modified, or supplemented, the "***CD II Factoring Agreement***") pursuant to which, among other things, (a) the Debtor sold and assigned to CIT, and CIT purchased, the Debtor's accounts, and CIT made loans, advances, and other financial accommodations to the Debtor, and (b) as security for the Debtor's indebtedness and obligations to CIT, the Debtor granted to CIT liens and security interests in substantially all of the Debtor's assets.

30.    On the same day it entered into its own Factoring Agreement, CD II guaranteed the payment and performance of Jump's indebtedness and obligations to CIT (the "***Guaranty***").

31.    On August 24, 2020, CIT filed Proof of Claim No. 13 in the Bankruptcy Case (the "***CIT Claim***") stating that as of the Petition Date, the Debtor was obligated to CIT for more than $24 million (the "***Pre-Petition Indebtedness***"), comprised of $11,077,612.49 of "***Direct Obligations***" of the Debtor under the CD II Factoring Agreement and $13,328,193.41 under the Guaranty (the "***Guaranty Obligations***").

32. The CIT Claim is secured by a lien and/or security interest in substantially all of the Debtor's personal property (the "***Pre-Petition Collateral***") and is perfected by a filed New York UCC financing statement.

33. To facilitate the liquidation of the Debtor's inventory (the "***Inventory***"), the Trustee and CIT entered into a court-approved Inventory Sales Agreement (the "***Inventory Sales Agreement***"), which, among other things, (a) granted to CIT a security interest in all accounts and proceeds arising from the post-petition sale of Inventory; (b) authorized Jump, as agent for the Trustee, without commission or fee, to sell the Inventory under specified terms and conditions; and (c) mandated the distribution of the Inventory sale proceeds first as a carve out to pay Trustee commissions, fees of the United States Trustee, and reasonable attorneys' and accountants' fees and expenses not to exceed $50,000.00, and then to CIT and other parties such as warehouses. (Doc. 48).

34. Thereafter, the Trustee and CIT twice extended the term of the Inventory Sales Agreement, which increased the Trustee's carve out to $125,000.

35. Pursuant to the Inventory Sales Agreement, CIT received and turned over to the Trustee sale proceeds of $1,651,595.79, net of certain expenses, fees, and costs (the "***Segregated Sales Proceeds***") to be held in a segregated account subject to the determination of the CIT Claim.

36. As of March 29, 2022, CIT held $629,998.37, representing collections of Inventory sales that it has not turned over to the Trustee (the "***Remaining Sales Proceeds***").

37. In addition, CIT collected accounts receivable sufficient to satisfy the Direct Obligations of the Debtor under the CD II Factoring Agreement. As of March 29, 2022, CIT

{12033982:1}                                              7

continues to hold excess collected pre-petition accounts receivable of $454,866.25 (the "**Excess A/R Proceeds**") that are subject to turn over upon the determination of the CIT Claim.

38.     CIT asserts that while the amount of the Debtor's Guaranty Obligations has changed since the Petition Date based on Jump's continued operations and use of its revolving line of credit under the Jump Factoring Agreement and the accrual of post-petition interest and other costs, the Estate remains liable for such amounts, which liability remains secured by CIT's liens and security interests in the Segregated Sales Proceeds, the Remaining Sales Proceeds, and the Excess A/R Proceeds. According to CIT, as of April 14, 2022, the Guaranty Obligations aggregated about $10 million plus any unliquidated amounts not yet charged into Jump's account.

**V.     The Heavily Negotiated Settlement Agreement and Summary of Settlement Terms**

39.     Beginning in the summer of 2021, counsel for the Trustee and the Jump Parties engaged in extensive settlement communications regarding (a) the Trustee's claims against the Jump Parties and their defenses to such claims, and (b) monetary constraints as to the Jump Parties' ability to pay a substantial settlement amount. These negotiations continued into 2022.

40.     As noted above, upon the Trustee and the Jump Parties' agreement in principle as to the terms of the settlement, the Trustee began settlement discussions with CIT in order to facilitate the Jump Parties' payment of the Settlement Amount as well as to resolve all potential claims between CIT and the Estate without the need for litigation.

41.     The resulting settlement reached by the Parties resolved all claims by the Estate against the Jump Parties and all claims between CIT and the Estate.[3]

---

[3] The Trustee respectfully refers the Court and parties in interest to the Settlement Agreement for its full terms and conditions. In the event of any inconsistency between this Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control.

{12033982:1}                                       8

42. The material terms of the Settlement Agreement are as follows:

- The Jump Parties will pay or cause to be paid[4] $5.3 million to the Trustee in two tranches: (i) an upfront payment of $4.8 million (the "***Upfront Settlement Payment***")[5] on the Effective Date (defined in the Settlement Agreement) and (ii) the remaining $500,000 (the "***Remaining Settlement Payment***") will be paid by the Jump Parties in twelve equal and consecutive monthly installments.

- CIT will release its Claim (Claim No. 13 in the Bankruptcy Case) and any claim it may have with respect to the Segregated Sales Proceeds, the CIT Held Funds and any other claims against the Estate.

- The Trustee will waive and release any interest the Estate may have in assets retained by CIT, except as otherwise provided for in the Settlement Agreement.

- The Trustee and the Estate will exchange general releases with CIT, Schlossberg, Baran, Gross, Jump, and Jump affiliate 350 Secaucus LLC.

- The Jump Parties will provide reasonable assistance in the Trustee's review of proofs of claim filed in the Bankruptcy Case.

## VI.    Relief Requested

43. By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Bankruptcy Approval Order attached as Exhibit "A" to the Settlement Agreement (Exhibit "1" to this Motion).

---

[4] Because Chubb will be contributing to the payment of the Settlement Amount, the proposed order approving the settlement (the "***Bankruptcy Approval Order***") will modify the automatic stay to permit the Parties to implement the Settlement Agreement.

[5] As set forth in the Settlement Agreement, the Upfront Settlement Payment consists of (i) $1,651,595.79, comprised of the Segregated Sales Proceeds; (ii) the CIT Held Funds (as defined in the Settlement Agreement) in the approximate amount of $1,084,864.62, comprised of the (a) Remaining Sales Proceeds ($629,998.37) and (b) the Excess A/R Proceeds ($454,866.25); and (iii) the balance of the Upfront Settlement Payment to be paid by the Jump Parties.

{12033982:1}                                     9

## VII.    Legal Basis

44.     Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate.  *In re Ionosphere Clubs, Inc*., 156 BR 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

45.     The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable.  *See In re Purified Down Prods.*, 150 B.R. at 522; *In re Drexel Burnham Lambert Group, Inc*., 134 B.R. at 505. The competency and experience of counsel supporting the settlement may also be considered. *Nellis*, 165 B.R. at 122.  Finally, the court should be mindful of the principle that "the law favors compromise."  *In re Drexel Burnham Lambert Group, Inc*., 134 B.R. at 505 (quoting *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976)).

46.     The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise; rather the court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *Liu v. Silverman (In re Liu)*, 1998 U.S. App. LEXIS 31698, at *3 (2d Cir. Dec. 18, 1998) (quoting *In re W.T. Grant Co*., 699 F.2d 599, 608 (2d Cir. 1983)); *see also Masonic Hall & Asylum Fund v. Official Comm. Of Unsecured Creditors (In re Refco, Inc.)*, 2006 U.S. Dist. LEXIS 85691, at *21-22 (S.D.N.Y. Nov. 16, 2006); *In re Ionosphere Clubs*, 156 B.R. at 426; *In re Purified Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the

underlying litigation"); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

47. In deciding whether a particular compromise falls within the "range of reasonableness," courts within the Second Circuit consider the following factors:

- the probability of success in the litigation;
- the difficulties associated with collection, if any;
- the complexity of the litigation, and the attendant expense, inconvenience, and delay; and
- the paramount interests of the creditors.

*In re Refco, Inc.*, 2006 U.S. Dist. LEXIS 85691 at *22; *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992), *cert. denied*, 506 U.S. 1088 (1993)).

48. In applying the foregoing factors, the Trustee respectfully submits that the Settlement Agreement falls well within the "range of reasonableness," and therefore satisfies the legal standard set forth by courts within the Second Circuit.

49. The Trustee submits that the terms of the Settlement Agreement are fair and equitable, and that its approval is in the best interest of the Estate and its creditors. The Trustee's Declaration in support of the reasonableness of the settlement is attached as **Exhibit "2"**.

50. The Settlement Agreement, which resolves all claims among the Parties, was the product of arm's length and good faith discussions between sophisticated and experienced counsel for the Parties that included several months of negotiations.

51. The settlement with the Jump Parties will result in a payment to the Estate of $5.3 million, which represents almost 55 percent of the Trustee's potential claims against the Jump Parties and removes the administrative costs and uncertainty of litigation.

52. The settlement also resolves all potential claims by and against the Estate and CIT and CIT's $24 million proof of claim.

(a) **Probability of Success in the Litigation.** The Trustee believes that he has a strong claim to recover the $1.5 Million Schlossberg Payment that may be susceptible to summary determination. The Jump Parties disagree.

On the other hand, the Trustee's claim to recover Additional Management Fees, representing the bulk of his claims, is fact intensive and less likely to be summarily determined in the Estate's favor. Jump was not a party to the CD II consulting agreement referencing the 6% Fee, and has asserted that the management fees charged to CD II were a function of the actual costs and expenses it incurred by using Jump's facility, staff, and services to facilitate CD II's operations. Jump argues that because CD II's business became much larger than Jump's over time, the Debtor's costs also increased, which compelled it to pay increased management fees to Jump to defray the higher expenses.

The Trustee believes that he has the better of the argument based on references to the 6% Fee in (a) the CD II consulting agreement, (b) CD II's general ledger entries and transaction reports, which indicate contemporaneously booked monthly entries for the 6% Fee, and (c) the Debtor's interim financial statements and supplementary information prepared by CD II's auditors for the period of January 2019 through June 2019, which describe the 6% Fee as a CD II operating expense.

Nonetheless, litigation would require extensive discovery, perhaps expert discovery, as to the reasonableness of the management fees charged and there is no certainty to what extent or if the Trustee would prevail. Moreover, as a practical matter, the Estate does not have the resources to engage in such burdensome litigation.

In addition, absent the Settlement Agreement, there could be a dispute as to the amount of indebtedness of the Debtor to CIT on the Guaranty Obligations. These issues might include whether the Guaranty Obligations constitute a fixed pre-Petition Date claim as to the Debtor, subject only to reductions as a result of paydowns by Jump (as the Trustee argues), or if the Guaranty Obligations continued and fluctuated post-petition (as CIT contends), and whether it is proper for CIT to include post-petition interest, fees, and costs in its claim. The Trustee has found no controlling case law on these issues and therefore the probability of success is unknown. Again, given the Estate's limited resources it would be difficult for the Trustee to engage in such costly litigation. .

(b) **The Difficulties Associated with Collection.** As noted above, CIT is holding collateral from Jump, and Schlossberg has pledged substantial assets to CIT. The Jump Parties have indicated that, absent partial funding through CIT, they would not have agreed to pay such a substantial Settlement Amount. Accordingly, there is considerable uncertainty as to whether the Trustee could collect on any substantial judgment against the Jump Parties if he were to pursue litigation.

(c) **Complexity of the Litigation and the Attendant Expense, Inconvenience, and Delay.** As set forth above, without the Settlement Agreement, complex issues relating to the legitimacy of the Additional Management Fees and the amount of the CIT Claim would have to be litigated. This could require the use of experts such as forensic accountants, which would add significantly to the costs and time required to get to and through a trial. Even a complete victory on the Trustee's claims may not lead to a significant, if any, distribution to unsecured creditors. The Settlement Agreement also eliminates the inevitable delay caused by future likely appeals, which benefits the Estate's creditors.

(d) **Paramount Interests of the Creditors.** The approval of the Settlement Agreement is in the best interest of creditors because it will remove the substantial costs of litigating the Parties' claims. In addition, the Settlement Agreement will create an estate for the benefit of unsecured creditors in the form of a significantly higher pro rata distribution than if litigation becomes necessary because the settlement is not approved. Because the Trustee does not anticipate that there will be any other matters requiring litigation, other than possible claims objections, creditors will receive their distributions much more quickly and the Bankruptcy Case can be fully be administered without the delays resulting from the complex litigation of the Parties' claims.

53. Based on the above, the Trustee respectfully submits that the Settlement Agreement falls well within the "range of reasonableness" based on (i) the range of possible litigation outcomes regarding the Parties' claims; (ii) the complexity of the potential litigation of such claims and the costs and delays related thereto; and (iii) the very large estate that would be created for the direct benefit of general unsecured creditors. *See* Declaration of Alan Nisselson in support of the Motion, attached as Exhibit "2".

## VIII. Notice And No Prior Request

54. The Trustee has given notice of this Motion to (i) the U.S. Trustee's Office, (ii) Sills Cummis LLP, attorneys for Jump, Schlossberg, and 350 Secaucus, LLC, (iii) Jump, Schlossberg, 350 Secaucus, LLC, Baran, and Gross, (iv) Thompson Coburn Hahn & Hessen, LLP, attorneys for CIT, (v) all creditors listed on the Debtor's schedules or who filed proofs of claim, and (vi) all entities having filed a notice of appearance and demand for notice by the date of this Motion. The Trustee respectfully submits that such notice constitutes good and sufficient

{12033982:1}                                    13

notice under the applicable Bankruptcy Rules and the Local Rules of this Court, and that no other notice is required.

55. No previous motion for the relief requested herein has been made to this or any other court.

### IX.  Conclusion

56. In sum, the Trustee submits that the Settlement Agreement should be approved (i) to avoid lengthy, burdensome, and expensive litigation as well as litigation risks, and (ii) because it represents a fair and reasonable compromise of the Parties' claims that greatly benefits the Estate. Because the Agreement is well within the "range of reasonableness" and confers substantial benefits on the Estate, the Trustee respectfully requests that the Court enter the Bankruptcy Approval Order.

**WHEREFORE,** the Trustee respectfully requests that the Court enter the Bankruptcy Approval Order approving the Settlement Agreement substantially in the form attached to the Settlement Agreement as Exhibit "A" (Exhibit "1" to this Motion), and grant such other and further relief as is just.

Dated: New York, New York  
April 15, 2022

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP  
*Attorneys for Alan Nisselson, Chapter 7 Trustee*

By:  */s/ Leslie S. Barr*  
Leslie S. Barr (lbarr@windelsmarx.com)  
156 West 56th Street  
New York, New York 10019  
Tel. (212) 237-1000 / Fax. (212) 262-1215

{12033982:1}                                    14

## EXHIBITS

Exhibit 1        Settlement Agreement

                    Exhibit A- Bankruptcy Approval Order

                    Exhibit B- Bill of Sale

Exhibit 2        Trustee's Supporting Declaration